## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NGA THI HOWARD, an individual,
derivatively and on behalf of herself
403 Danbridge Street
Gaithersburg, MD 20878

               Plaintiff,

    v.

PETER J. GOODMAN, an individual
3034 Dent Place NW
Washington, DC 20007

HELEN H. RUAN, an individual
267 Velvetlake Drive 26
Sunnyvale, CA  94089-2052

CA SOLUTIONS, LLC, a California
Limited Liability Company
267 Velvetlake Drive
Sunnyvale, CA  94089-2052

              Defendants,

and

KAZOO LLC, a District of Columbia
Limited Liability Company
3034 Dent Place NW
Washington, DC 20007

            Nominal Defendant.

Civil Action No.: 1:20-cv-2187

## VERIFIED COMPLAINT FOR UNITHOLDER DERIVATIVE AND DIRECT CLAIMS, DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff Nga Thi Howard, as an individual, and derivatively on behalf of Nominal Defendant Kazoo LLC for her complaint against Defendants Peter J. Goodman, Helen H. Ruan, and CA Solutions, LLC hereby states as follows:

## NATURE OF THE ACTION

1.     Plaintiff Nga Thi Howard, aka "Luna" ("Ms. Howard") brings this action individually and derivatively for the benefit of Nominal Defendant Kazoo LLC ("Kazoo" or "Company") against Defendants Peter J. Goodman ("Mr. Goodman"), Helen H. Ruan ("Ms. Ruan") and CA Solutions, LLC ("CA Solutions"), as individuals (collectively, "Defendants"). Ms. Howard is the co-founder, co-Manager and a Member of Kazoo who seeks relief to remedy Mr. Goodman's mismanagement, self-dealing, diversion of Company assets and funds, fraudulent conduct, breaches of the Company's operating agreement and violations of law. Ms. Howard further seeks relief to stop the Defendants misappropriation of trade secrets, conspiracy and competition with Kazoo.

2.     Mr. Goodman froze Ms. Howard out of the Company and concealed his actions from her. Prior to Ms. Howard being ousted, Kazoo had approximately $80,000 in working capital. After removing Ms. Howard's access to all Company information, Mr. Goodman drained the Company's bank account by withdrawing approximately $60,000 over the course of a month and a half, more than $28,000 of which has been diverted to either Mr. Goodman or Ms. Ruan. The Company is now left with approximately $20,000 to operate.

3.     Ms. Howard has made repeated demands that Mr. Goodman provide information and repay the funds that he stole from Kazoo. Mr. Goodman refuses to do so. As a result, Ms. Howard has been forced to file this lawsuit in the best interests of the Company.

## PARTIES

4.     Plaintiff, Nga Thi Howard, aka "Luna," at all times relevant to this Complaint, is and was the co-founder, Manager and a Member of Kazoo. Ms. Howard is a resident and citizen of the State of Maryland and resides at 403 Danbridge Street, Gaithersburg, Maryland 20878.

5.      Defendant Peter J. Goodman is currently a co-founder, Manager, interim CEO, President and Member of Kazoo.  Mr. Goodman is a resident and citizen of the District of Columbia and resides at 3034 Dent Place NW, Washington, DC 20007.  At all relevant times material to the allegations made in this Complaint, Mr. Goodman was a co-founder Manager, Member, and President of Kazoo.

6.      Defendant Helen H. Ruan is the sole member, manager and partner of CA Solutions.  Ms. Ruan is a resident and citizen of the State of California and resides at 267 Velvetlake Drive, Sunnyvale, California 94089-2052.  At all relevant times material to the allegations made in this Complaint, Ms. Ruan was the Manager of CA Solutions.

7.      Defendant CA Solutions, LLC is a California limited liability company formed on August 2, 2007.  CA Solutions at all relevant times material to the allegations made in this Complaint, had its primary place of business at 267 Velvetlake Drive, Sunnyvale, California 94089-2052.  CA Solutions is an alter-ego identity of Ms. Ruan.  Ms. Ruan is the sole member, manager and partner of CA Solutions.

8.      Nominal Defendant Kazoo LLC is a District of Columbia professional limited liability company formed on April 4, 2019.  Kazoo has, at all relevant times material to the allegations made in this Complaint, had its primary place of business at 3034 Dent Place NW, Washington, DC 20007.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (a)(1) insomuch as the amount in controversy exceeds the sum or value of the $75,000, exclusive of interest and costs, and is between citizens of different States.

10.     This Court has personal jurisdiction over Defendants pursuant to D.C. Code § 13-422, as Mr. Goodman and Kazoo are domiciled in and Kazoo is organized under the laws of and maintains its principal place of business in the District of Columbia, and Defendants availed themselves of the District's laws.

11.     Venue is appropriately laid in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Mr. Goodman and Kazoo are residents of the District of Columbia.  In addition, a substantial part of the events or omissions giving rise to the claim occurred in the District and Defendants have availed themselves to the laws of the District of Columbia by conducting regular business in the District.

12.     An actual and justiciable controversy exists between Plaintiff and Defendants in that Ms. Howard has suffered harm and continues to suffer harm as a result of the Defendants' misconduct and violations of law, and the harm can be redressed through injunctive relief.

## FACTUAL ALLEGATIONS

A.      **Background**

13.     Ms. Howard is the child of a U.S. serviceman, raised by her mother in post-war Vietnam.  At the age of 17, homeless and struggling to survive, Ms. Howard fled to the U.S. for the opportunity to start a new life.  After arriving in Maryland, Ms. Howard taught herself English and through tenacity and drive, she started several businesses.  Ms. Howard is the

mother of two teenage daughters, and she works around the clock to pay for their education and support them.

14.    Ms. Howard's friend has a child with hydrocephalus, a chronic, neurological condition caused by an abnormal accumulation of cerebrospinal fluid, resulting in pressure on the brain.  Her friend was always fearful that if her child were to have seizure or the medical device that treats her hydrocephalus were to fail, both she and emergency personnel would not know where to reach her.  The need and desire to help her friend sparked Ms. Howard's idea for an application ("app") that would combine social app technologies into one easy to use tool to connect, track and protect close friends and family.  Ms. Howard has personally loaned approximately $280,000 of her personal retirement funds to Kazoo because she believes the technology that Kazoo has developed and continues to develop will help people.

15.    Mr. Goodman was the CEO of Orrbis LLC ("Orrbis"), a D.C. company that offered location alerts, real-time GPS location tracking, and location history.  He approached Ms. Howard in or around February 2019 and suggested partnering to develop and launch Ms. Howard's idea.  Ms. Howard and Mr. Goodman decided to form a new entity that would become known as Kazoo.

16.    There are currently 12 Members of Kazoo who hold Series B Units and are entitled to vote ("Members").  Seven of the Members were introduced to Ms. Howard by Mr. Goodman.

17.    Ms. Howard fully trusted Mr. Goodman and was unaware that he was secretly undermining Kazoo and getting other Members to vote to condone his misconduct.

**B.**     **Creation of Kazoo**

1.      In or around early April 3, 2019, Ms. Howard and Mr. Goodman confirmed the

terms of their business arrangement with counsel to Orrbis and Kazoo, George Lawler of

Whiteford Taylor Preston, LLP ("WTP").  Mr. Goodman agreed that Ms. Howard would receive

a 12% equity stake in Orrbis, serve as chief executive officer ("CEO") of Kazoo and have a 30%

equity stake in Kazoo, while Orrbis would own the remaining 70% of Kazoo.  Further each

Orrbis member would receive ownership in Kazoo proportional to their ownership in Orrbis.

Mr. Goodman confirmed the terms of the deal with counsel:

> **From:** Peter Goodman <peter@familysignal.com>
> **Sent:** Wednesday, April 3, 2019 10:09 AM
>
> **To:** Lawler, George S. <glawler@wtplaw.com>
> **Cc:** lunanh@aol.com
> **Subject:** Follow-up materials: Orrbis/Kazoo
>
> \*     \*     \*
>
> **ORRBIS**
> Luna will receive a 12% equity stake in Orrbis; her title will be Vice President, Business Development.
> \*     \*     \*
>
> **KAZOO**
> 1.  Luna will serve as CEO of a Kazoo.  Luna will have a 30% equity stake in Kazoo; Orrbis will own the remaining 70% (Orrbis shareholders will get a pro-rata stake in Kazoo).

2.      On April 4, 2019, Ms. Howard and Mr. Goodman created Kazoo.

3.      On April 5, 2019, Mr. Goodman again confirmed the terms of Ms. Howard's

equity in Orrbis and Kazoo:

> **From:** peter@familysignal.com,
> **To:** glawler@wtplaw.com,
> **Cc:** lunanh@aol.com,
> **Subject:** Re: Follow-up materials: Orrbis/Kazoo
> **Date:** Fri, Apr 5, 2019 5:00 pm
> **Attachments:** FilingCertificate.pdf (111K), Articles of Organization.pdf (112K),
> \*     \*     \*
> Regarding your comments on the Orrbis Operating Agreement, my responses are in red.
> \*     \*     \*

I would assign some number of Units to the present Members to account for 100%.  Yes.

As for Luna, as she is to receive 12%, I would divide the number of Units I use in the revision by .88. If we assume, as an example, that I use 10M units for the current owners, dividing that by .88 results in 11,363,636 Units, such that 1,363,636 would be awarded to Luna.  Luna and I discussed, and this is fine.

Of those, 25%, or 340,909, would vest upon award/grant. Another equal number would vest upon the Company having raised $200k (I would need an outside date for that and it should not be tied to her efforts as we wish to avoid her being deemed to be a broker-dealer receiving sales commissions in the form of vesting Units. Rather, we would phrase it as the Company raising at least $200k on or before a stated date.  As you will see, the 340,909 as a percentage of 11,363,636 is 3%.  This sounds fine - we'll discuss a date.

\*     \*     \*

It appears that Kazoo starts out as a wholly-owned subsidiary of Orrbis. Then, presumably, Luna will be awarded some number of Units to achieve her 30%. No vesting is indicated in your email to me.  It is not technically correct to state that Orrbis "shareholders" (as they are "Members") will get a pro-rata stake in Kazoo (they will have an indirect ownership stake through their ownership of Units in Orrbis).  We defer to you with regard to structure - Luna will be fully vested with her 30%.

4.     Ms. Howard is currently a co-founder, Manager and Member of Kazoo, and she has been since the creation of Kazoo.

5.     Mr. Goodman is currently a co-founder, Manager, interim CEO, President and Member of Kazoo.  He owns and operates other businesses in addition to Kazoo.

6.     Since the creation of Kazoo, Ms. Howard has personally loaned approximately $280,000 to the Company.

## C.     **Background of the Kazoo App**

7.     Kazoo's chief product is a mobile application designed to be the ultimate application in providing people with safety and security measures, as well as a way to stay connected with their family and friends.

8.     Kazoo is a cutting-edge, social app that allows the user to manage who sees their location information.  Kazoo live streams video calls to the user's emergency contacts and those contacts are able to see the video, location and contact information, and are able to contact emergency services directly in-app.  Through installing the Kazoo app on a phone, it could immediately notify authorities and the user's family and friends about a potentially unsafe situation.

9.      The Kazoo app offers SOS live on scene video which no other apps provide.  This technology, allows the user in crisis to do the following:  (i) instantly livestream video of the unfolding scene; (ii) receive communication from emergency contacts; (iii) call 911 (local authorities) on one screen; (iv) see which contacts are actively viewing or have viewed the stream; (v) take photos during the live stream; and (vi) automatically save the incident to the cloud.

10.     The Kazoo app allows the emergency contact to: (i) instantly view the live stream of the incident; (ii) pinpoint the exact location of the user in crisis; (iii) view incoming phone number to connect to location emergency call centers; (iv) share live link with first responders and authorities; (v) communication with user in crisis; (vi) rewind live stream; and (vii) automatically save the incident to the cloud.

11.     In June 2020, Kazoo secured a partnership with a leading public safety technology company that provides life-saving data from millions of connected devices to 911 and first responders.  This technology will allow Kazoo to offer precise 30-day location history, which could potentially help with COVID-19 contact tracing, and connects with 4,700 emergency call centers around the country with 93% U.S. coverage.

12.     On May 9, 2019, Ms. Howard and Mr. Goodman, as well as other members holding units in Kazoo, signed and executed the Limited Liability Company Agreement of Kazoo, LLC ("May 2019 Operating Agreement").[1]

---

[1]     There are two operating agreements at issue in this Action.  Hereinafter, "Operating Agreement" refers to both the May 2019 Operating Agreement and the Amended Operating Agreement where there are no material differences.

**D.**   **Pathmazing Develops Source Code for the Kazoo App**

13.   Under a Consulting Services Agreement between Kazoo and Pathmazing, Inc.

("Pathmazing"), dated April 1, 2019 ("Consulting Agreement"), attached hereto as Exhibit 1,

Pathmazing began to develop source code for the friends and family safety app that Kazoo

wanted to develop ("Kazoo App").

14.   Pathmazing is a corporation in Cambodia and also a Member of Kazoo.

15.   The Consulting Agreement provides that while certain "Inventions," including

source code, shall be the sole property of Kazoo, the proprietary rights in those Inventions shall

belong to Kazoo **only upon full payment** for Pathmazing's services:

> 6.   <u>Inventions</u>.  Pathmazing agrees that all Confidential Information
> and all other discoveries, inventions, ideas, concepts, trademarks, service
> marks, logos, processes, products, formulas, computer programs or
> software, source codes, object codes, algorithms, machines, apparatuses,
> items of manufacture or composition of matter, or any new uses therefor
> or improvements thereon, or any new designs or modifications or
> configurations of any kind, or works of authorship of any kind, including,
> without limitation, compilations and derivative works, whether or not
> patentable or copyrightable, conceived, developed, reduced to practice or
> otherwise made by Pathmazing, either alone or with others, and in any
> way related to or arising out of: (i) the Consulting Services or (ii)
> Confidential Information of Client, whether or not conceived, developed,
> reduced to practice or made on Client's premises (collectively
> "Inventions"), and any and all services and products which embody,
> emulate or employ any such Invention or Confidential Information shall
> be the sole property of Client and, upon full payment of the compensation
> set forth in Schedule A, all copyrights, patents, patent rights, trademarks
> and reproduction rights to, and other proprietary rights in, each such
> Invention or Confidential Information, whether or not patentable or
> copyrightable, shall belong exclusively to Client without further
> compensation of any kind to Pathmazing. Pathmazing agrees that all such
> Inventions shall constitute works made for hire under the copyright laws
> of the United States and hereby assigns and, to the extent any such
> assignment cannot be made at the present time, agrees to assign to Client,
> without any additional consideration from Client, any and all copyrights,
> patents and other proprietary rights he may have in any such Invention,
> together with the right to file and/or own wholly without restrictions
> applications for United States and foreign patents, trademark registration

and copyright registration and any patent, or trademark or copyright registration issuing thereon, and Pathmazing hereby grants to Client an irrevocable Power of Attorney to execute such assignments and make such filings. Pathmazing agrees to waive, and hereby waives, all moral rights or proprietary rights in or to any Invention and, to the extent that such rights may not be waived, agree not to assert such rights against Client or its licensees, successors or assigns.

*See* Consulting Agreement § 6.

16.     Further, the Consulting Agreement requires that the source code be accessed and stored in a repository on Pathmazing's premises ("Source Code Repository") and ***only while authorized personnel are actively working on the source code***.

> <u>Software Repository</u>.  Client will establish a private account with a reputable software development platform and version control repository ("Source Code Repository") for the term of this Agreement and will be solely responsible for paying all costs and fees associated therewith. Pathmazing will immediately upload to the Source Code Repository all source code and other software, design materials, documentation and compiled objects, and all versions thereof, written or otherwise developed pursuant to this agreement (Client Materials). Pathmazing is responsible for ensuring that all Client Materials are stored in the Source Code Repository. Client Materials must only be accessed and stored on computers located on Pathmazing's premises while authorized personnel are actively working on the Client Materials. Client Materials must be transferred and stored in the Source Code Repository at all other times. Client materials must not be stored on or accessed from any type of portable device unless required for the specific purpose of developing and testing mobile code/applications. Pathmazing may only store Client Materials for as long as it is required and for the purposes set forth herein. Pathmazing must securely delete Client materials from all computers and devices when the services are completed or terminated, unless Client has approved in writing that Client Materials can be retained for an agreed period of time. After the retention period has expired, all Client Materials in Pathmazing's possession or control must be permanently deleted from all computers, devices and backup media. Pathmazing must promptly provide to Client written confirmation of deletion of Client materials. Pathmazing shall keep an accurate and up-to-date inventory for all Client materials in Pathmazing's possession. Such inventory should include a detailed description of the physical device name, device type, device location and purpose (e.g., Source Code Repoitory, test system, build system) and the names of the system owners. Pathmazing shall share such inventory with Client upon client request.

*See* Consulting Agreement § 6.

17.     As of the date of this Complaint, Kazoo has not paid for Pathmazing's consulting

services and therefore Kazoo does not own the proprietary rights in the source code.

**E.     The Kazoo May 2019 Operating Agreement**

18.     On May 9, 2019, Orrbis, Ms. Howard and Mr. Goodman executed the Limited

Liability Company Operating Agreement of Kazoo LLC, dated May 9, 2019 ("May 2019

Operating Agreement"), attached hereto as Exhibit 2.

19.     The initial unitholders of Series B units ("Members") were Orrbis, Ms. Howard

and Mr. Goodman.  Members are entitled to vote.  *See* Exhibit 2, Schedule A.

20.     Section 8.2 of the May 2019 Operating Agreement named Kazoo's initial Board

of Managers.  Section 8.2 provides in pertinent part:

> (a) Composition; Initial Managers. The Board shall consist of up to five
> (5) Managers. Managers need not be Members or residents of the District
> of Columbia. Each Manager shall serve in such capacity until his
> successor has been elected or until such person's death, resignation or
> removal. Orrbis LLC, an initial Series B Member, shall be entitled to
> name two (2) Persons as Managers so long as it owns at least a majority of
> the Series B Units. Orrbis LLC hereby names Peter J. Goodman as a
> Manager of the Company. Nga Thi ("Luna") Howard, an initial Series B
> Member, shall be entitled to name herself as a Manager so long as she
> owns at least 25% of the Series B Units AND remains active in the
> Company's business. Howard hereby names herself as a Manager of the
> Company. The Series B Members by consent of the holders of at least
> two-thirds (2/3rds) of the issued and outstanding Series B Units may name
> any additional Managers to the Board and may amend this Agreement to
> change the size or composition of the Board; provided, however, that the
> Series A voting rights for a Board member may not be amended without
> the consent of the holders of at least a majority of the issued and
> outstanding Series A Units. . Series A Members and Series C Members
> shall have no voting rights for any purposes hereunder.
>
> (b) Removal. Any Manager may be removed with or without cause only
> by the consent of the Series B Member who named such Manager to the
> Board, and, for other Managers, by the holders of at least two-thirds of the
> outstanding Series B Units.

(d) Vacancies. In the event that a vacancy is created on the Board by the death, disability, retirement, resignation or removal of any Manager, such vacancy shall be filled only by vote or consent of the Member(s) who designated such Manager.

21.     Section 8.3 of the May 2019 Operating Agreement provided that certain actions

required a super majority vote:

Except as expressly provided otherwise by this Agreement, the affirmative vote of the holders of at least two-thirds (2/3rds) of the Series B Units shall constitute the act of the Members. Any action permitted or required by Law or this Agreement to be taken by the Members shall be taken without a meeting, without prior notice and without a vote, by a consent in writing, setting forth the action so taken, provided to all Members entitled to vote at least 48 hours prior to the proposed action, and signed by the holders of outstanding Units having not less than the minimum number of votes necessary to authorize or take such action. Prompt notice of the taking of such action by less than a unanimous written consent shall be given by the Secretary to those Members who have not consented in writing. Any Units owned by the Company, directly or indirectly, shall not be counted for purposes of any such written consent.

22.     Section 8.5 of the May 2019 Operating Agreement provides that certain decisions

require the consent of both Managers when there are two Managers.  Section 8.5 provides in

pertinent part:

(a) To the full extent permitted by Law, the following actions may be taken by the Board and shall not require any action by the Members. Any such action shall, except as otherwise provided, require the vote or consent of at least two-thirds (2/3rds) of the Managers including, as applicable and as noted below, the affirmative vote or consent of the Series A Manager so long as there is a Series A Manager on the Board, and may not be delegated to the Officers; provided, however, that if a Manager is incapacitated then any action may be taken by the unanimous consent of the remaining Managers: . . .

(iv) any capital expenditures in excess of $15,000 and not contemplated by any Budget or the Company's strategic plan;

(v) any agreement, commitment or option to sell, acquire, or divest, or any sale, acquisition, or divestiture, of assets with a purchase price or fair market value in excess of $15,000 and not contemplated by any Budget or the Company's strategic plan; . . .

(vii) any approval of any Budget, including without limitation the Annual Budget, and any expenditures during the period covered by such Budget that, except as permitted above, exceed the amounts approved or that are other than as provided in such Budget;

(viii) any agreement contract with or by the Company with an amount in excess of $15,000;

(ix) any transaction, contract or agreement with a value in excess of $5,000 with any Officers, Managers or Affiliates of the Company or any Subsidiary, or any increase in compensation of any Manager or Officer beyond a cost of living increase and any bonus or other payment including any deferred compensation to any Manager or Officer, which will require the unanimous consent of the Managers, including the Series A Manager, in utmost good faith; . . .

(xv) any engagement in any activities not contemplated by this Agreement.

23.     Section 9.1 of the May 2019 Operating Agreement provides for individual liability of Managers upon the breach of certain fiduciary duties:

(a) No Manager nor any Affiliate thereof shall be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in its capacity as a Manager or any member of a committee of the Board except for (i) liability for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of Law, (ii) liability with respect to any transaction from which such Person derived an improper personal benefit, and (iii) liability from any breach of such Person's duty of loyalty to the Company, in each case described in clauses (i), (ii) and (iii) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction.

24.     Section 9.1(a) comports with D.C. Code § 29-804.09.

25.     Section 10.6 of the May 2019 Operating Agreement provides that "[e]ach Member agrees not to compete with the business of the Company."

26.     The May 2019 Operating Agreement provides for amendment, but any amendment that adversely affects a Member requires prior written consent of the Member so adversely affected.  Section 13.5 provides in pertinent part:

Neither this Agreement (including any Exhibit or Schedule hereto), nor the Articles may be amended, modified, supplemented or restated, nor may any provisions of this Agreement or the Articles be waived, without a written instrument adopted, executed and agreed to by the holders of at least two-thirds of the Series B Units; *provided*, *however*, that . . . any amendment that would adversely affect one or more Series B Members but not all Series B Members shall also require the prior written consent of the holders of a majority of the Series B Units held by those Series B Members so adversely affected; (ii) subject to the following sentence, any such amendment, modification, supplement, restatement or waiver that would adversely affect the rights of any Member hereunder, without similarly affecting the rights hereunder of all Members of the same class or series, taken as a whole, shall not be effective as to such Member without such Member's prior written consent . . . .

**F.     Mr. Goodman Begins to Conspire with Ms. Ruan to Misappropriate Kazoo's Source Code and Take Steps to Steal Kazoo Source Code**

27.     In or around April 2020, Mr. Goodman proposed merging or combining Kazoo's technology with StealthTalk Inc. ("StealthTalk"), a cyber-defense company that boasts that it can use military-grade encryption to allow "[b]usinessmen worldwide…to make untraceable calls and send undecipherable messages that remain invisible."  Ms. Howard disagreed.

28.     On or around June 9, 2020, Mr. Goodman contacted, Nick Nuth, an employee of Pathmazing in Cambodia, via Skype and told Mr. Nuth that he did not have access to the Source Code Repository.  Mr. Goodman then asked Mr. Nuth to send him the source code as a zip file.

29.     Mr. Goodman falsely stated that Kazoo was in the middle of getting a "big investment from a big company" and the company needed to do due diligence on Kazoo's source code before they decide.  Mr. Nuth asked Mr. Goodman for the name of the "big company" and Mr. Goodman said it was confidential.  Unbeknownst to Mr. Nuth, there was no company that needed Kazoo's source code.  Relying on Mr. Goodman's false statements, Mr. Nuth provided the source code to Defendant Goodman.

30.     Mr. Goodman knew that he was not authorized to download the source code from the Source Code Repository, so he tricked Mr. Nuth into giving it to him.  When Mr. Nuth went

back to look for the Skype messages, he learned that Mr. Goodman had deleted the Skype

messages prior to 7:41pm on or around June 9, 2020 showing that Mr. Goodman asked for the

source code.

**G. Mr. Goodman Fraudulently Induces Ms. Howard to
Sign the Amended Operating Agreement and
<u>Fraudulently Alters the Amended Operating Agreement</u>**

31.     In or around early June 2020, Mr. Goodman suggests to Ms. Howard that he

needs the CEO title to be able to negotiate with a crowdfunding platform that allows private

citizens to invest in startup companies.

32.     On or around June 22, 2020, Ms. Howard agreed to name Mr. Goodman interim

CEO solely to handle the crowdfunding and then as Managers, they both would agree to name a

replacement CEO.  Thus, Ms. Howard agreed to amend Section 8.4(g) of the May 2019

Operating Agreement to name Mr. Goodman as the interim CEO.

33.     Ms. Howard also agreed that if she and Mr. Goodman disagreed on the

enumerated Board actions listed in Section 8.5 of the May 2019 Operating Agreement, a vote of

the holders of 50.1% of the Series B Units could break the tie.  Thus, Ms. Howard agreed to

amend Section 8.5(a) of the May 2019 Operating Agreement to reflect this agreement.

34.     On or around June 22, 2020, Ms. Howard, Mr. Goodman and Mr. Lawler spoke

by phone about the amendments to the May 2019 Operating Agreement.  Ms. Howard asked Mr.

Goodman and Mr. Lawler to confirm that she and Mr. Goodman would remain Managers and

that the only changes would be to Section 8.4(g) and Section 8.5(a) of the May 2019 Operating

Agreement.

35.     Mr. Goodman and Mr. Lawler confirmed that no other changes would be made to

the May 2019 Operating Agreement.  Mr. Goodman rushed Ms. Howard to sign an amended

operating agreement telling her falsely that it was critical for the document to be signed prior to a

meeting with FirstNet Built with AT&T ("FirstNet") planned for June 26, 2020, when in reality he wanted to change the terms of the May 2019 Operating Agreement to allow him to unilaterally enter into contracts with Ms. Ruan to compete with Kazoo and to freeze out Ms. Howard.

36.     On or around June 25, 2020, Mr. Goodman sent a document titled "11397065-v1-Amended_and_Restated_Operating_Agreement_Kazoo_LLC.pdf" through DocuSign, a computer program that allows recipients to sign documents electronically.  Mr. Goodman sent this document using Envelope ID 002bdc0c-4443-42bb-a013-d29a6ff10dc2 ("Envelope 1").  Mr. Goodman and Ms. Howard signed the document sent in Envelope 1.

37.     Minutes after Ms. Howard signed, and before Pathmazing could sign, Mr. Goodman voided Envelope 1 and noted in DocuSign that he was "[s]ending new doc."

38.     Mr. Goodman then sent a document purporting to be "11397065-v1-Amended_and_Restated_Operating_Agreement_Kazoo_LLC.pdf" through Envelope ID c33af186-5b53-4cfc-bd71-fe87ad0e89c6 ("Envelope 2").

39.     Mr. Goodman sent Ms. Howard at least a series of at least five text messages on June 24-25, 2020, urging Ms. Howard to rush to get Pathmazing signature.  He told Ms. Howard that it was critical to sign "in the next few hours" and that Pathmazing should "sign the latest one."  Mr. Goodman falsely stated the "main change is that Peter is the interim ceo and that voting is a majority of unit holders."  Ms. Howard and Pathmazing relied on Mr. Goodman's representations and signed the document sent via Envelope 2.  Ms. Howard and Pathmazing later learned that Mr. Goodman's statement was false because he had altered numerous sections of the May 2019 Operating Agreement that Ms. Howard had not agreed to change.

40.     Attached hereto as Exhibit 3 is the Limited Liability Company Operating Agreement of Kazoo LLC, dated June 22, 2020, and effective July 1, 2020 ("Amended Operating Agreement").  It bears the same Envelope ID as Envelope 2, but the version number has been removed.

41.     Mr. Goodman fraudulently induced Ms. Howard to sign Exhibit 3 by altering the document that Ms. Howard thought she was signing.  Other than the agreed upon changes to Section 8.4(g) and Section 8.5(a), the other material changes are fraudulent, invalid, unenforceable and severable under Section 13.7(d) of the Amended Operating Agreement.

42.     Mr. Goodman also fraudulently altered Schedule A to the Amended Operating Agreement.  On December 28, 2019, Ms. Howard reminded Mr. Goodman by email that Schedule A did not include her 12% Orrbis equity.  Within four days, Mr. Goodman provided an amended Schedule A.  Ms. Howard relied on Mr. Goodman's prior representation that he would correctly state her ownership and trusted that the amended Schedule A would reflect the 12% Orrbis equity that she had reminded him about.  Ms. Howard later learned that Mr. Goodman omitted her 12% Orrbis equity from Schedule A, thereby incorrectly stating Ms. Howard's ownership interest in Kazoo.  As a result, Mr. Goodman has misstated the Percentage Interest of Series B Units for all Members.  Ms. Howard has repeatedly tried to correct Mr. Goodman's misstatement of her ownership interest in Kazoo.

**H.     Mr. Goodman Conspires with Ms. Ruan to Enter Into, and Does Enter Into, a Secret Agreement to Divert Kazoo's Funds to Himself and Ms. Ruan**

43.     The real rush for signing the fraudulent Amended Operating Agreement was so that Mr. Goodman and Ms. Ruan could usurp Kazoo's corporate opportunities.

44.     Ms. Howard and Mr. Goodman were to meet with FirstNet on June 26, 2020 to discuss a distribution agreement for the Kazoo App, among other proprietary matters.  Prior to

that meeting, Mr. Goodman proposed to MS. Howard that Ms. Ruan join the meeting with FirstNet.  Ms. Howard told Mr. Goodman that she did not agree because Ms. Ruan was not a Member of Kazoo and should not have access to Kazoo's confidential information when Ms. Ruan was interested in developing a product that could compete with Kazoo.

45.     On or before June 25, 2020, Mr. Goodman and Ms. Ruan conspired to enter into an agreement between Kazoo and CA Solutions (which was really an alter-ego of Ms. Ruan) to filter money to Ms. Ruan and to continue to develop a competing product under the guise of a consulting arrangement.

46.     Kazoo and CA Solutions entered into an Independent Contractor Agreement ("CA Contract"), dated June 25, 2020, attached hereto as Exhibit 4.  Mr. Goodman unilaterally entered into the CA Contract in violation of the May 2019 Operating Agreement.  Section 8.5(a)(viii) required both Mr. Goodman and Ms. Howard to consent to any contract with Kazoo for an amount in excess of $15,000.  The CA Contract obligated Kazoo to pay CA Solutions $32,600.

47.     On August 5, 2020, Mr. Goodman provided a list of transactions for the Kazoo checking account between June 17 to August 5, 2020.  The last time Ms. Howard saw the Kazoo checking account balance was June 17, 2020.

48.     The bank statement showed that on June 19 and June 26, 2020, Kazoo received a total of *$59,926.13*.  Since June 19, 2020, Mr. Goodman has withdrawn, debited, transferred or otherwise spent *$61,971.70* without Ms. Howard's knowledge or consent.

49.     Based on Ms. Howard's review of the bank statement, she identified improper charges totaling *$49,077.96*.  A list describing each fraudulent transaction currently known to Ms. Howard, including the date and amount of each transaction is included below.  Mr. Goodman diverted at least *$28,263* to pay himself and Ms. Ruan.

| DATE | DESCRIPTION | DISPUTED AMOUNT |
|---|---|---|
| 6/22/2020 | Venmo payment | $412.00 |
| 6/24/2020 | ACH payment to Mr. Goodman's credit card | $703.00 |
| 6/30/2020 | ACH debit for consulting | $3,400.00 |
| 6/30/2020 | ACH payment to Mr. Goodman's credit card | $586.00 |
| 7/01/2020 | Transfer of funds to Mr. Goodman's bank account | $4,000.00 |
| 7/03/2020 | Amazon purchase | $886.56 |
| 7/06/2020 | Wire Transfer to vendor | $1,500.00 |
| 7/06/2020 | Transfer of funds to Mr. Goodman's bank account | $3,400.00 |
| 7/06/2020 | Venmo payment | $309.00 |
| 7/15/2020 | ACH debit for consulting | $7,300.00 |
| 7/17/2020 | Wire transfer for legal fees | $5,000.00 |
| 7/17/2020 | Wire transfer to vendor | $1,500.00 |
| 7/17/2020 | Staples purchase | $104.92 |
| 7/20/2020 | Venmo payment | $360.50 |
| 7/27/2020 | Wire transfer to vendor | $4,500.00 |
| 7/27/2020 | ACH payment to Mr. Goodman's credit card | $975.00 |
| 7/30/2020 | Wire transfer for legal fees | $5,000.00 |
| 7/30/2020 | ACH payment to Mr. Goodman's credit card | $599.00 |
| 7/31/2020 | ACH debit for consulting | $7,300.00 |
| 08/03/2020 | Google purchase | $324.99 |
| 8/04/2020 | Amazon purchase | $916.99 |

50.     Since inception, Kazoo has received approximately $115,000 in investor funds.
Kazoo had approximately $80,000 in working capital before Mr. Goodman froze Ms. Howard
out of the Company.  After removing Ms. Howard's access to all Company information, Mr.
Goodman withdrew approximately $60,000 over the course of a month and a half, more than
$28,000 of which has been diverted to either Mr. Goodman or Ms. Ruan.  The Company is now
left with approximately $20,000 to operate.

51.     Mr. Goodman drafted statements and disclosed to potential investors, investors
and Members that the Company's "operational expenses have averaged $2,500/month."
Moreover, Mr. Goodman represented to a crowdfunding source that funds from the
crowdfunding source would not be used to pay back debt or loans.  He has now unilaterally
burned more than $60,000 in a month and a half.  Mr. Goodman's actions have drained the

Company's operating capital and severely jeopardized the existence of the Company and investor returns.

52.     On August 6, 2020, Ms. Howard demanded justification for the transactions reflected in paragraph 49 above.  Mr. Goodman refused to provide justification.

I.     **Mr. Goodman Develops a Fraudulent Scheme to
Conceal His Activity and Cut Out Ms. Howard**

53.     Mr. Goodman knew he had to hide his unauthorized activity.  On July 3, 2020, Mr. Goodman sent Ms. Howard a letter stating that she was terminated as Manager of Kazoo, effective immediately ("Termination Letter").  The Termination Letter stated that "a written consent has been signed by the holders of a majority of the Series B Units to remove you as a Manager of the Company."

54.     The Termination Letter stated that if Ms. Howard communicated with "any customers, any corporate partners, any investors, and any vendors hired by the company or other third parties on behalf of the company," Kazoo would "vigorously pursue any legal or equitable remedies available to the Company."

55.     In response to her purported termination and the threat of legal action, Ms. Howard sought legal advice.

56.     Ms. Howard and other Members did not receive the purported written consent terminating Ms. Howard in violation of Section 8.3 of the Operating Agreement, which requires that written consent by "provided to all Members entitled to vote at least 48 hours prior to the proposed action."  Ms. Howard informed Mr. Goodman that the written consent was ineffective and demanded to see the document that Mr. Goodman had referenced in the Termination Letter.

57.     On July 29, 2020, 26 days after Ms. Howard was informed that she had been terminated, Mr. Goodman, through counsel, provided what he purported to be the authentic

written consent terminating Ms. Howard ("First Consent"), attached hereto as Exhibit 5. However, the First Consent is a forged document that Mr. Goodman altered.  The First Consent purports to be a PDF dated July 1, 2020, but it contains an image of a document within a PDF with signatures that have been copied and pasted into the PDF.

58.     The First Consent also purports to name Ms. Ruan as a Manager of Kazoo.

59.     Acknowledging that the First Consent was ineffective, on August 8, 2020, Mr. Goodman attempted to send another written consent to Members ("Second Consent"), attached hereto as Exhibit 6.  The Second Consent, dated August 8, 2020, purports to remove Ms. Howard as a Manager of Kazoo, effective after consent is received from a majority of the issued and outstanding Series, but in no event earlier than 48 hours after a copy of the Second Consent is provided to all Members entitled to vote.

60.     This time Ms. Ruan is not named as a Manager of Kazoo.

61.     The Second Consent further attempts to ask Members to approve and ratify "all actions taken by Peter J. Goodman in his capacity as Manager and CEO of the Company between June 23, 2020 and the Effective Time" of the consent.

62.     Pursuant to D.C. Code 29-804.09, Members may authorize or ratify "***a specific act or transaction*** that otherwise would violate the duty of loyalty" but only "***after full disclosure of material facts***."  Any purported ratification would be ineffective because Mr. Goodman has not identified any specific act or transaction that Members would be ratifying, and he has not provided full disclosure of material facts.  The Second Consent is further deceptive and fraudulent behavior to conceal his misconduct from Ms. Howard and the Members.

63.     As of the date of this Complaint, the Second Consent has not been signed by a majority of holders of a majority of Series B Units.

**J.**     **Ms. Howard Demands to See Kazoo's Books and Records**

64.     On or before July 3, 2020, Mr. Goodman blocked Ms. Howard from accessing her

Kazoo email account and Kazoo bank records thereby concealing information related to Mr.

Goodman's and Ms. Ruan's misconduct.  Therefore, Ms. Howard was forced to demand to see

information regarding the Company's activities and affairs, financial condition and other

circumstances material to her rights and duties under the Operating Agreement.

65.     On July 10, 2020, Ms. Howard, through counsel, sent an information demand to

Kazoo's counsel, formally requesting records and information pursuant to Section 10.5(a) of the

Operating Agreement and D.C. Code § 29-804.10.  *See* Exhibit 7.  Ms. Howard made a

reasonable demand for the written consent that purportedly terminated her as a Manager,

documents to determine her equity ownership, access to her Company email, documents related

to the Operating Agreement, financial records and other documents related to business decisions

made without Ms. Howard's consent.

66.     Section 10.5(a) of the Operating Agreement provides that "[e]ach Manager shall

have access to all information regarding the company" and each Member shall be entitled to

obtain information relating to the Company as provided in the Operating Agreement "or to the

extent required by the Act," where the Operating Agreement defines the "Act" as the District of

Columbia Limited Liability Company Act and any successor statute, as amended.  The Act is

embodied in D.C. Code §§ 29-801.01 *et seq*.

67.     D.C. Code § 29-804.10(a)-(b) provides that Kazoo shall furnish certain

information to a Manager.  As described above, Ms. Howard is and has always been a Manager

of Kazoo.

68.     On demand, Kazoo must provide Ms. Howard with reasonable information

regarding the Company's "activities and affairs, financial condition, and other circumstances."

69.     Without demand, Kazoo must provide Ms. Howard with information concerning the Company's "activities and affairs, financial condition, and other circumstances" which is "material" to the proper exercise of Ms. Howard's rights and duties under the Operating Agreement or the Act.

70.     Although Mr. Goodman had improperly deemed Ms. Howard to be a Member and not a Manager at the time of her information demand, the Act still required Kazoo to provide information to Ms. Howard because she sought information for a purpose material to her interest as a Member, she described the information sought and the purpose for seeking the information with reasonable particularity and the information sought was directly connected to Ms. Howard's purpose.

71.     On July 14, 2020, Mr. Lawler stated that he had spoken to Mr. Goodman about the demand but that "my firm is unable to provide representation at this time in connection with this matter" and he advised counsel for Ms. Howard to contact Mr. Goodman directly.

72.     That same day, Mr. Goodman confirmed by email to counsel for Ms. Howard that he received Ms. Howard's demand and asked for 48 hours to respond.

73.     Ms. Howard, through counsel, sent a letter later that same day reiterating her demand for information and prioritizing certain items, including the written consent purportedly terminating her, access to her Kazoo email and documents related to Ms. Howard's equity ownership. *See* Exhibit 8.

74.     On July 15, 2020, Kazoo, through new counsel, Calhoun Bhella & Sechrest ("CBS"), informed Ms. Howard that they were awaiting files from WTP. *See* Exhibit 9.

75.    That same day, Ms. Howard, through counsel, emphasized that time was of the essence and that the information demanded is "basic information that should be readily available" to Mr. Goodman.  *See* Exhibit 10.

76.    On July 24, 2020, Kazoo, through counsel, agreed to provide the written consent that purportedly terminated Ms. Howard but asked to meet and confer about the information demand.  *See* Exhibit 11.

77.    That same day, Ms. Howard, through counsel, reiterated that the "information demand is straightforward" and that there was no basis for Kazoo to further withhold information to which Ms. Howard was entitled.  *See* Exhibit 12.

78.    During a telephone call on July 27, 2020, counsel for Kazoo informed counsel for Ms. Howard that it was still awaiting records from Kazoo and WTP.

79.    On July 29, 2020, Kazoo, through counsel, provided the First Consent, the document that Mr. Goodman forged.  *See* Exhibit 5.

80.    Three days later, CBS withdrew as counsel for Kazoo.

81.    Mr. Goodman retained counsel with Shulman Rogers to represent him individually, and Ms. Howard, through counsel, continued to demand information.  Between July 31, 2020 and August 7, 2020, Ms. Howard repeatedly tried to get a full response to her information demand to no avail.

82.    On August 10, 2020, Mr. Goodman, through counsel, sent 23 documents to Ms. Howard.  These documents, however, do not fully respond to Ms. Howard's July 10, 2020 information demand.  *See* Exhibit 7.

83.     As of the filing of this Complaint, Mr. Goodman has refused to fully provide the requested records, and he is the only person with access to the full set of information Ms. Howard has demanded.

84.     Mr. Goodman has withheld information that Ms. Howard is entitled to receive under the Operating Agreement and the Act.  As a result, Mr. Goodman has caused Ms. Howard and Kazoo to needlessly incur tens of thousands of dollars in costs and fees related to Ms. Howard's information demand.

## K.     Advancement

85.     The Operating Agreement provides that Kazoo shall advance reasonable expenses incurred by a Manager who is threatened with legal action.  Section 9.3 states:

> The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 9.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; *provided*, *however*, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 9 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 9 or otherwise.

86.     Section 9.2, which governs indemnification, states in pertinent part:

> [E]ach person who is threatened to be made a party to…any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "Proceeding"), . . . by reason of the fact that such Person . . . is or was or has agreed to become a Manager or an Officer . . . whether the basis of such Proceeding is alleged action in an official capacity as a Manager or Officer or in any other capacity while serving or having agreed to serve as a Manager or Officer, shall be indemnified and held harmless by the Company against all expense, liability and loss (including judgments, penalties, excise and

> similar taxes, punitive damages, fines, amounts paid in settlement or to be
> paid in settlement and attorneys' fees) actually incurred or suffered by
> such Person in connection with such Proceeding....Notwithstanding
> anything to the contrary in this Section 9.2, no Manager or Officer shall be
> entitled to indemnification hereunder if it is determined by a final,
> nonappealable order of a court of competent jurisdiction that such Person
> did not act in good faith and in a manner such Person reasonably believed
> to be in or not opposed to the best interests of the Company, or had
> reasonable cause to believe such person's conduct was un[l]awful.

87.     On July 3, 2020, Mr. Goodman threatened Ms. Howard with legal action if she exercised her rights as a Manager.  Under Section 9.2 of the Operating Agreement, the threatened action is a Proceeding.  Accordingly, Ms. Howard is entitled to advancement.

88.     On July 15, 2020, Ms. Howard, through counsel, delivered a written undertaking and affirmation of good faith to Mr. Goodman and Kazoo in accordance with the requirements of Sections 9.2 and 9.3 of the Operating Agreement.  Therefore, Ms. Howard is entitled to advancement.

89.     On July 24, 2020, Kazoo, through counsel, denied Ms. Howard's demand for advancement.

90.     As of the filing of this Complaint, Kazoo has not paid or reimbursed Ms. Howard for any expenses.

## DERIVATIVE ALLEGATIONS

91.     Ms. Howard brings this action, in part, derivatively for the benefit of Kazoo and its Members to redress injuries suffered and to be suffered by Kazoo and its Members as a direct result of the breaches of fiduciary duties, acts of fraud and conversion and breaches of contract by Mr. Goodman.

92.     Ms. Howard has been a Co-Founder, Manager, CEO and Member of Kazoo during the wrongful course of conduct by Mr. Goodman as alleged herein, and Ms. Howard continues to be a Co-Founder, Manager and Member.

93.     Ms. Howard will adequately and fairly represent the interests of Kazoo and its Members in enforcing and prosecuting their rights and has retained counsel competent and experienced in derivative litigation.

94.     Ms. Howard has not made a demand on the other Manager, Mr. Goodman, to bring suit asserting the derivative claims set forth herein because Mr. Goodman is incapable of disinterestedly considering a demand to initiate an action on behalf of Kazoo against himself. Mr. Goodman suffers from a conflict of interest and divided loyalties which preclude him from exercising independent business judgment.

95.     Demand on Mr. Goodman would be futile because:  (a) Ms. Howard has been completely frozen out of the business and operations of Kazoo and despite repeated requests to Mr. Goodman for access to the books and records of Kazoo, Ms. Howard has been denied such access; (b) Mr. Goodman has been engaging in a continuing course of self-dealing using the assets and funds of Kazoo for his personal use and benefit unrelated to any legitimate company purpose and to the determinant of Ms. Howard and Kazoo; and (c) Mr. Goodman is neither disinterested or independent.

**<u>COUNT 1</u>**
**(Breach of Fiduciary Duties)**
***Derivative Claim by Plaintiff Howard Against Defendant Goodman***

96.     Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety

97.     Mr. Goodman, in his capacity as a Member and Officer of Kazoo, owed fiduciary duties of care, loyalty, good faith and disclosure to both Kazoo and their Members.

98.     Mr. Goodman breached his fiduciary duty by breaching Section 9.1 of the Operating Agreement which states "[n]o Manager . . . shall be liable to the Company or any

Member . . . except for (i) liability for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the Law, (ii) liability with respect to any transaction from which such Person derived an improper personal benefit, and (iii) liability from any breach of such Person's duty of loyalty to the Company . . . ."  Id. 9.1(a).

99.     In addition to breaching the Operating Agreement itself, Mr. Goodman also breached the fiduciary duties imposed as a matter of law under the District of Columbia law, including the duties he holds as a Member of Kazoo, such as, refraining from engaging in intentional misconduct and knowing violations of the law.

100.     Specifically, Mr. Goodman's conduct above violated D.C. Code § 29-804.09.

101.     As a Manager and Officer of Kazoo, as those terms are defined under the Operating Agreement and D.C. Code § 29-804.09, Mr. Goodman owes Kazoo and its Members the highest duties of care, loyalty, good faith and candor.  Mr. Goodman's duties include, without limitation, obligations to account to the Company and to hold as trustee for it any property or benefit belonging to the Company, refrain from competing with the Company, avoid self-dealing, avoid conflicts of interest in connection with the management of the Company, deal honestly and with forthrightness with Ms. Howard and Members and to refrain from knowing violations of the law.

102.     As detailed in paragraphs 27-94 above, Mr. Goodman has been engaging in a continuing course of self-dealing using the assets and funds of Kazoo for his personal use and benefit to the detriment of Kazoo and its Members.  Mr. Goodman's self-dealing, conflicts of interest and breaches of fiduciary duties have been ongoing since in or around April 2020 and include, without limitation:

a. Diverting, wasting and misappropriating more than $83,000 of cash and other assets belonging to Kazoo;

b. Misappropriating Kazoo's Confidential Information to compete with Kazoo;

c. Purporting to remove Ms. Howard as a Manager of Kazoo as a means to further his wrongdoing;

d. Causing Kazoo to wrongfully withhold information to Ms. Howard and Members that Kazoo is required to provide under the Operating Agreement and the Act;

e. Attempting to ask Members to ratify his wrongful conduct without identifying the specific acts or transactions and without full disclosure of all material facts; and

f. Making false statements, creating false documents and committing knowing violations of the law in the conduct of the Company's activities and affairs.

103.    Mr. Goodman's misconduct against Kazoo has been willful, intentional and a known violation of the law.

104.    For the foregoing reasons, Mr. Goodman breached his fiduciary duties under the Operating Agreement, causing damage to Kazoo.

## COUNT 2
### (Conversion)
### *Derivative Claim by Plaintiff Howard Against All Defendants*

105.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety

106.     Defendants Mr. Goodman, Ms. Ruan and CA Solutions, without the knowledge or consent of Ms. Howard or the Members, have converted investments, assets or funds of Kazoo and transferred such investments, assets or funds into their personal bank accounts or applied the funds against their personal credit cards as detailed in paragraph 49 above.

107.     In her individual capacity regarding Kazoo and her partnership capacity with Kazoo, Ms. Howard has demanded the return of the foregoing property, and Mr. Goodman has refused.

108.     For the foregoing reasons, Mr. Goodman has unlawfully converted Ms. Howard's property, causing damage to Kazoo.

**COUNT 3**
**(District of Columbia Uniform Trade Secrets Act (DCUTSA):**
**D.C. Code §§ 36-401 − 36-410)**
*Derivative Claim by Plaintiff Howard Against All Defendants*

109.     Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

110.     Defendants conspired to misappropriate trade secrets and engage in deceptive trade practices.

111.     Mr. Goodman obtained trade secrets improperly and misappropriated them to Ms. Ruan in violation of D.C. Code §§ 36-401 to 405.  Section 36-401(1) defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means."  It defines "misappropriation" as "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "[d]isclosure or use of trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret…"  Id. § 401(2).

112.     Kazoo's confidential source code is a trade secret as it underpins a cutting-edge app that is unlike anything else on the market.  As such, it derives independent economic value by remaining confidential.  The source code could only be viewed on a restricted repository. This code was not generally known to or readily ascertainable by others through proper means.

113.     Mr. Goodman (1) acquired Pathmazing's trade secrets developed for Kazoo through improper means (the unauthorized access and copying of Kazoo's data); (2) knew the data constituted trade secrets; and (3) knew he had acquired and disclosed the source code in violation of Mr. Goodman's covenants to Kazoo, which required Mr. Goodman to maintain the secrecy of that data.

114.     Mr. Goodman knowingly misappropriated Kazoo's trade secrets through improper means by fraudulently obtaining the source code and, upon information and belief, disclosing the source code to Ms. Ruan and CA Solutions and using it to develop a competing product.

115.     Ms. Ruan and CA Solutions acquired Kazoo's source code from Mr. Goodman and knew or should have known that the source code was acquired by improper means because they knew Ms. Howard did not consent to using Kazoo's technology to develop a product with StealthTalk.

116.     As such, Mr. Goodman's misconduct violated the law prohibiting misappropriation of trade secrets which prohibits the acquisition of trade secrets by improper means, or improper use or disclosure by one under a duty not disclose.

117.     Ms. Howard has no adequate remedy at law in that the harm set forth above cannot be fully compensated in monetary damages.

118.    Mr. Goodman's misconduct as set forth above has caused and will continue to cause Ms. Howard irreparable harm in that Ms. Howard (through the Company) has lost control of its trade secrets and Confidential and Proprietary Information and that information has been provided to and is being used by a competitor.

119.    As a direct and proximate result of Defendants conspiring to misappropriate trade secrets, Kazoo has suffered damages.

**COUNT 4**
**(Defend Trade Secrets Act (DTSA):  18 U.S. Code § 1836)**
*Derivative Claim by Plaintiff Howard Against All Defendants*

120.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

121.    Defendants obtained trade secrets improperly and misappropriated them in violation of 18 U.S. Code § 1836.

122.    Kazoo's confidential source code is a trade secret as it underpins a cutting-edge app that is unlike anything else on the market.  As such, it derives independent economic value by remaining confidential.  The source code could only be viewed on a restricted repository. This code was not generally known to or readily ascertainable by others through proper means.

123.    The source code underlies Kazoo's app which is intended for use in interstate commerce.

124.    Mr. Goodman (1) acquired Pathmazing's trade secrets developed for Kazoo through improper means (the unauthorized access and copying of Kazoo's data); (2) knew that the data constituted trade secrets; and (3) knew he had acquired and disclosed the source code in violation of his covenants to Kazoo, which required Mr. Goodman to maintain the secrecy of that data.

125.    Mr. Goodman knowingly misappropriated Kazoo's trade secrets through improper means by fraudulently obtaining the source code and, upon information and belief, disclosing the source code to Ms. Ruan and CA Solutions and using it to develop a competing product.

126.    Ms. Ruan and CA Solutions acquired Kazoo's source code from Mr. Goodman and knew or should have known that the source code was acquired by improper means because they knew Ms. Howard did not consent to using Kazoo's technology to develop a product with StealthTalk.

127.    As such, Mr. Goodman's misconduct violated the law prohibiting misappropriation of trade secrets which prohibits the acquisition of trade secrets by improper means, or improper use or disclosure by one under a duty not disclose.

128.    Ms. Howard has no adequate remedy at law in that the harm set forth above cannot be fully compensated in monetary damages.

129.    Mr. Goodman's misconduct as set forth above has caused and will continue to cause Ms. Howard irreparable harm in that Ms. Howard (through the Company) has lost control of its trade secrets and Confidential and Proprietary Information and that information has been provided to and is being used by a competitor.

130.    As a direct and proximate result of Defendants misappropriating trade secrets, Kazoo has suffered damages.

### COUNT 5
**(Civil Conspiracy)**
***Derivative Claim by Plaintiff Howard Against All Defendants***

131.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

132.    In furtherance of the scheme as described above, Mr. Goodman and Ms. Ruan have been and remain engaged in a conspiracy and course of misconduct to break Mr. Goodman's contractual promises to Kazoo, to deprive Kazoo of the benefits of its bargains under those agreements, to mask Mr. Goodman's cooperation with and contributions towards StealthTalk, to compete directly with Kazoo, to misappropriate and exploit Kazoo's trade secrets, Confidential and Proprietary Information, goodwill and other valuable assets and to deprive Kazoo of significant actual and prospective revenue, profits, customers, goodwill and market growth opportunities.

133.    The Defendants' misconduct as set forth above has caused and will continue to cause Kazoo irreparable harm, in that Kazoo's trade secrets, and Confidential and Proprietary Information have been misappropriated and that information has been provided to and is being used by a competitor.

134.    As a direct and proximate result of Defendants conspiring, Kazoo has suffered damages.

### COUNT 6
**(Fraud)**
***Derivative Claim by Plaintiff Howard Against All Defendants and***
***Direct Claim by Plaintiff Howard Against Defendant Goodman***

135.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

136.    Mr. Goodman falsely, intentionally and knowingly misrepresented to Ms. Howard or concealed from Ms. Howard that she would remain a Manager of Kazoo and any changes in the Amended Operating Agreement would not materially affect her position as a Manager of the Company.  Mr. Goodman further falsely stated that the only material changes in the Amended

Operating Agreement would be to name him as interim CEO in Section 8.4(g) and that holders of a majority of the Series B units could break a tie for the actions listed in Section 8.5(a).

137.    Mr. Goodman intended to induce Ms. Howard's reliance on these misrepresentations and material omissions.  Mr. Goodman knew that any amendments that adversely affected Ms. Howard required Ms. Howard's prior written consent.  Further, Mr. Goodman knew at the time of his misrepresentations that he intended to change other portions of the Amended Operating Agreement and in fact did make changes that adversely affected Ms. Howard without her prior written consent.

138.    Ms. Howard, in fact, justifiably relied on the material misstatements and omissions made by Mr. Goodman when she agreed to the changes in the Amended Operating Agreement.

139.    As a direct and proximate result of Mr. Goodman committing fraud, Ms. Howard has been damaged.

140.    Defendants falsely, intentionally and knowingly misrepresented to Kazoo or concealed from Kazoo that they were reviewing the source code and engaging Ms. Ruan in order to improve Kazoo's application, when in fact they were stealing Kazoo's trade secret to build a rival application.

141.    Defendants intended to induce Kazoo's reliance on these misrepresentations and material omissions.

142.    Kazoo, in fact, justifiably relied on the material misstatements and omissions made by Defendants in permitting them to review the source code and to engage Ms. Ruan as a consultant.

143.    As a direct and proximate result of Defendants committing fraud, Kazoo has been damaged.

## COUNT 7
### (Fraud in the Inducement: Amended Operating Agreement)
### *Direct Claim by Plaintiff Howard Against Defendant Goodman*

144.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

145.    Mr. Goodman falsely, intentionally and knowingly misrepresented to Ms. Howard or concealed from Ms. Howard that she would remain a Manager of Kazoo and any changes in the Amended Operating Agreement would not materially affect her position as a Manager of the Company.  Mr. Goodman further falsely stated that the only material changes in the Amended Operating Agreement would be to name him as interim CEO in Section 8.4(g) and that holders of a majority of the Series B units could break a tie for the actions listed in Section 8.5(a).

146.    Mr. Goodman's misrepresentation was material to Ms. Howard's decision to sign the contract.

147.    Mr. Goodman made the misrepresentation with the knowledge that it was false or the reckless disregard as to the truth.

148.    Mr. Goodman intended to induce Ms. Howard's reliance on these misrepresentations and material omissions.  Mr. Goodman knew that any amendments that adversely affected Ms. Howard required Ms. Howard's prior written consent.  Further, Mr. Goodman knew at the time of his misrepresentations that he intended to change other portions of the Amended Operating Agreement and in fact did make changes that adversely affected Ms. Howard without her prior written consent.

149.     Ms. Howard, in fact, justifiably relied on the material misstatements and omissions made by Mr. Goodman when she agreed to the changes in the Amended Operating Agreement.

150.     As a direct and proximate result of Mr. Goodman's fraudulent inducement, Ms. Howard has suffered damages.

## COUNT 8
### (Breach of Contract: Section 8.3 Operating Agreement)
### *Direct Claim by Plaintiff Howard Against Defendant Goodman*

151.     Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

152.     Mr. Goodman breached the requirement to give consent in writing to Members pursuant to the Operating Agreement § 8.3.  Section 8.3 states that "[a]ny action permitted or required by Law or this Agreement to be taken by the Members shall be taken without a meeting, without prior notice and without a vote, by a consent in writing, setting for the action so taken, provided to all Members entitled to vote at least 48 hours prior to the proposed action . . . ."

153.     Mr. Goodman breached Section 8.3 of the Operating Agreement by not providing written consent to the Members at least 48 hours before he terminated Howard.

154.     As a direct and proximate result of Mr. Goodman breaching Section 8.3 of the Operating Agreement and not giving consent in writing to Members, Ms. Howard has suffered damages.

## COUNT 9
### (Breach of Contract:  Section 10.6 Operating Agreement)
### *Direct Claim by Plaintiff Howard Against Defendant Goodman*

155.     Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

156.    Mr. Goodman breached the non-compete section of the Operating Agreement § 10.6.  Section 10.6 states that "[e]ach Member agrees not to compete with the business of the Company."

157.    Mr. Goodman breached the contract regarding his obligations of non-competition causing damages to Ms. Howard.  Mr. Goodman violated his obligations to not engage in any business activity other than for Kazoo, and specifically not for any business competitive with and providing similar services as Kazoo.

158.    Mr. Goodman's breaches of the non-competition clauses in Section 10.6 of the Operating Agreement are among the most flagrant.  He contracted with Ms. Ruan and her company, directly or indirectly, for the purpose or with the effect of, competing with any business of Kazoo, including attempting to involve in Ms. Ruan in confidential negotiations between Kazoo and FirstNet.

159.    Mr. Goodman further contracted not to use or disclose any of Kazoo's Confidential or Proprietary Information, and to refrain from solicitation and competitive activities.

160.    Mr. Goodman's breach of Section 10.6 as set forth above has caused and will continue to cause Ms. Howard irreparable harm in that Ms. Howard's trade secrets and Confidential and Proprietary Information were misappropriated, and that information has been provided to and is being used by a competitor.

**COUNT 10**
**(Breach of Contract: Section 8.5(a)(iv) May 2019 Operating Agreement)**
***Direct Claim by Plaintiff Howard Against Defendant Goodman***

161.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

162.    Mr. Goodman breached the section of the May 2019 Operating Agreement §
8.5(a)(iv) which requires Board approval for contracts that exceed $15,000.  Section 8.5(a)(iv)
states that "any capital expenditures in excess of $15,000 and not contemplated by any Budget or
the Company's strategic plan" "require the vote or consent of at least two-thirds (2/3rds) of the
Managers" or the Board.

163.    Mr. Goodman without approval from the Board or Ms. Howard (the other
Member) entered into a contract on behalf of Kazoo with Ms. Ruan, where the Company agreed
to pay Ms. Ruan $32,600 for her consulting services, far in excess of the $15,000 permitted by
the May 2019 Operating Agreement.

164.    By failing to get the consent of the Board or Ms. Howard, Mr. Goodman breached
Section 8.5(a)(iv) of the May 2019 Operating Agreement.

165.    As a direct and proximate result of Mr. Goodman breaching Section 8.5(a)(iv) of
the May 2019 Operating Agreement, Ms. Howard has suffered damages.

## COUNT 11
### (Breach of Contract: Section 9.3 Operating Agreement)
#### Direct Claim by Plaintiff Howard Against Nominal Defendant Kazoo

166.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of
this Complaint as if fully set forth in their entirety.

167.    Nominal Defendant Kazoo has failed to advance expenses in breach of the
Operating Agreement § 9.3.  Section 9.3 of the Operating Agreement provides that the right to
indemnification shall include the right to be advanced reasonable expenses incurred, "without
any determination as to the Person's ultimate entitlement to indemnification," provided that the
person deliver to the company a written undertaking to repay all amounts advanced if it is
determined that he or she is not entitled to be indemnified.

168.     In the ordinary course of its activities, Kazoo may advance reasonable expenses, including attorney's fees and costs, incurred by Ms. Howard in connection with defending litigation in her capacity as a member of Kazoo.

169.     Pursuant to Section 9.3 of the Operating Agreement, Ms. Howard is entitled to advancement of the expenses, including attorney's fees that she has incurred in connection with the Underlying Action, beginning on or around July 3, 2020.

170.     On July 15, 2020, Ms. Howard sent a letter to Defendants Mr. Goodman and Kazoo in accordance with the requirements of Sections 9.2 and 9.3 of the Operating Agreement requesting advancement and undertaking to repay such amounts if it is ultimately determined she was not entitled to indemnification.

171.     Ms. Howard has met all conditions precedent to her entitlement of advancement.

172.     Ms. Howard has incurred, and will continue to incur, expenses in connection with the Underlying Action.

173.     As a direct and proximate result of Kazoo failing to advance expenses, Ms. Howard has suffered damages.

174.     The legal expenses Ms. Howard has incurred to date, and expects to incur in the future, in connection with the Underlying Action are reasonable.

175.     Ms. Howard is also entitled to an Order requiring Kazoo to pay any future expenses that Ms. Howard will incur in connection with the Underlying Action.

**<u>COUNT 12</u>**
**(Breach of Contract: Section 10.5(b) Operating Agreement)**
***Direct Claim by Plaintiff Howard Against Defendant Goodman***

176.     Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

177.     Mr. Goodman breached the confidentiality section of the Operating Agreement

§ 10.5(b).  Section 10.5(b) states that "[e]ach Member agrees that all Confidential Information

shall be kept confidential by such Member and shall not be disclosed by such Member in any

manner whatsoever" except under specific circumstances.

178.     Mr. Goodman breached Section 10.5(b) by providing Confidential Information to

Ms. Ruan.

179.     As a direct and proximate result of Mr. Goodman breaching Section 10.5(b) the

Operating Agreement, Ms. Howard has suffered damages.

### COUNT 13
**(Unjust Enrichment)**
*Derivative Claim by Plaintiff Howard Against All Defendants*

180.     Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of

this Complaint as if fully set forth in their entirety.

181.     As set forth above, Ms. Howard conferred substantial and valuable benefits upon

Defendants.

182.     Defendants have retained those benefits.

183.     Under the circumstances, it would be unjust to permit Defendants to retain the

benefits without compensating Ms. Howard in a manner consistent with the terms of the

Operating Agreement.

184.     Thus, although Ms. Howard maintains that there is in a place an express contract

between the parties hereto, to the extent that it is determined that no express contract exists

between them, there is a quasi-contract between them, which Defendants have breached by

failing and refusing to fairly and justly compensate Ms. Howard.

185.    Ms. Howard is entitled to restitution in an amount consistent with the terms of the Operating Agreement.

<u>**COUNT 14**</u><br>**(Inspection of Books and Records: Section 10.5(a) Operating Agreement;**<br>**D.C. Code § 29-804.10)**<br>*Direct Claim by Plaintiff Howard Against Defendant Goodman*<br>*and Nominal Defendant Kazoo*

186.    Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

187.    Ms. Howard is entitled to access Kazoo's books and other financial and corporate records as a Manager and Member under the Operating Agreement § 10.5(a) and pursuant to D.C. Code § 29-804.10.

188.    Section 10.5 of the Operating Agreement states that managers "shall have access to all information regarding the company" and that members, "shall only be entitled to obtain information relating to the Company expressly provided in this Agreement or to the extent required by the Act."

189.    Section 29-804.10 allows any member of a manager-managed limited liability company to "inspect and copy . . . any record maintained by the company regarding the company's activities and affairs, financial condition, and other circumstances . . . ."

190.    Ms. Howard provided reasonable notice of her desire to inspect records maintained by Kazoo regarding the company's activities and affairs, financial condition and other circumstances which the company knows are material to the proper exercise of Ms. Howard's rights and duties under the Operating Agreement and under the D.C. Limited Liability Act.

191.   On July 10, 2020, Ms. Howard requested access to Kazoo's books and other financial and corporate records, but to date, Kazoo has refused to provide the same in breach of the Operating Agreement and in violation of D.C. Code § 29-804.10.

192.   Ms. Howard is entitled to information demanded under the Operating Agreement and D.C. Code § 29-804.10.

193.   Although Ms. Howard has provided reasonable notice, Kazoo has failed and refused to timely provide the aforesaid documents and information.

<u>**COUNT 15**</u>
**(Advancement: Section 9.3; D.C. Code § 29-804-08)**
*Direct Claim by Plaintiff Howard Against Defendant Goodman*
*and Nominal Defendant Kazoo*

194.   Ms. Howard restates and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth in their entirety.

195.   Mr. Goodman and Nominal Defendant Kazoo have failed to advance expenses in violation of Section 9.3 of the Operating Agreement and D.C. Code § 29-804-08.

196.   Pursuant to Section 9.3 of the Operating Agreement and D.C. Code § 29-804.08, Kazoo must pay or reimburse reasonable expenses incurred by a manager under certain conditions.

197.   At all relevant time Ms. Howard has been a Manager of Kazoo.

198.   Mr. Goodman initiated a Proceeding as that term is defined under Section 9.2 of the Operating Agreement.  Therefore, advancement is required.

199.   As a direct and proximate result of Mr. Goodman failing to advance expenses, Ms. Howard has suffered damages.

200.    The costs and expenses Ms. Howard has incurred to date, and expects to incur in the future, in connection with the Proceeding are reasonable, especially given Mr. Goodman's delay and refusal to comply with the Operating Agreement and D.C. law.

201.    Ms. Howard is also entitled to an Order requiring Kazoo to pay any future expenses that Ms. Howard will incur in connection with the Proceeding.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in her favor and that this Court grant the following relief:

A.    Declaratory judgment that:

    1.    The material provisions and schedules that adversely affect Ms. Howard were altered without Ms. Howard's written consent and therefore are invalid or unenforceable and severed from the Amended Operating Agreement;

    2.    For the severed provisions, the May 2019 Operating Agreement controls;

    3.    The Consents purporting to remove and replace Ms. Howard as a Manager are invalid and *ultra vires*;

    4.    The Second Consent purporting to ratify all of Mr. Goodman's misconduct is invalid and *ultra vires*;

    5.    The Contract between Kazoo and CA Solutions that Mr. Goodman entered into without Ms. Howard's knowledge or consent is null and void;

    6.    Ms. Howard is entitled to the information demanded as a Manager of Kazoo; and

    7.    Ms. Howard is entitled to advancement under the Operating Agreement.

B.    Preliminary and permanent injunction:

1.     Ordering that Defendants return Kazoo's Trade Secrets and Confidential Information and cease and desist misappropriation;

2.     Enjoining Defendants from further misappropriating Kazoo's Trade Secrets;

3.     Enjoining Mr. Goodman from competing with Kazoo;

4.     Ordering Defendant Goodman to provide Ms. Howard with access to her Kazoo email account and Kazoo's bank account;

5.     Ordering Mr. Goodman to repay all funds wrongfully diverted from Kazoo, including all profits derived therefrom;

6.     Enjoining Mr. Goodman from further diversion of Kazoo funds;

7.     Ordering the removal of Mr. Goodman from Kazoo's financial accounts;

8.     Enjoining Mr. Goodman from conducting business activity or entering into contracts or other obligations on behalf of Kazoo;

9.     Order the removal of Mr. Goodman as a Manager and Officer of Kazoo;

10.    Ordering Mr. Goodman to provide fully respond to Ms. Howard's information demand and provide access to the requested books and records;

11.    Ordering an accounting; and

12.    Ordering Kazoo to advance expenses to Ms. Howard.

C.     Compensatory damages in an amount to be proven at trial, but in no event less than $75,000, exclusive of interest and costs;

D.     Punitive damages;

E.     Double damages under D.C. Code § 36-403 or, alternatively, exemplary damages under 18 U.S.C. § 1836;

F.     Seizure of Trade Secrets under 18 U.S.C. § 1836;

G.      Pre- and post-judgment interest; and

H.      Costs and reasonable attorneys' fees.

I.      Such other and further relief as may be necessary and appropriate.


Date:   August 10, 2020                    Respectfully submitted,

                                            */s/ David Mills*
                                           David E. Mills (DC Bar 401979)
                                           Dana J. Moss (DC Bar 1003416)
                                           COOLEY LLP
                                           1299 Pennsylvania Avenue NW
                                           Washington, DC 20004
                                           Tel.: (202) 842-7800
                                           Fax: (202) 842-7899
                                           dmills@cooley.com
                                           dmoss@cooley.com


                                           ***Counsel for Plaintiff Nga Thi Howard***


231088734